IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JOSEPH LAMAR KNIGHT,     :
                                :
     Plaintiff,           :          CIVIL ACTION NO.
                                :          1:09-CV-1790-AT
     v.                 :
                                :
BEN A. FINLEY, individually; J.R.     :
CLARK, individually; L.E. TANNER,     :
individually; ROBIN RIFFLE,     :
individually; R.H. FREEMAN,     :
individually; DAVID MARSH,     :
individually; and MARK HOFFMAN,     :
individually,                  :
                                :
     Defendants.       :

## O R D E R

This matter is before the Court on Defendants' motion for summary judgment. [Doc. 50.] Plaintiff Joseph Knight, who was 67 years old at the time of the incidents at issue in this case, filed this action against several law enforcement officers with the Forsyth County Sheriff's Office based on alleged Fourth Amendment violations.[1] This case centers on an incident in August 2007 that began with Mrs. Knight calling the Forsyth County 911 emergency number to secure an ambulance for her husband and ended with law enforcement shooting

---

[1] The predecessor district court judge handling this case previously dismissed Plaintiff's claims against the Forsyth County Sheriff's Office, the John Doe Defendants, Forsyth County, Ted Paxton, and D.T. Smith and allowed Plaintiff to proceed with his claims against the named officers in their individual capacities. (Doc. 27.)

Mr. Knight with a soft bullet and forcefully arresting him after he had barricaded himself inside his home.  For the reasons set forth below, the Court finds that under current Eleventh Circuit law, Defendants are entitled to qualified immunity on Plaintiff's claim that Defendants unlawfully entered and remained in his home.  Captain Hoffman, Sergeant Finley, and Deputy Marsh are not entitled, viewing the record in the light most favorable to Plaintiff, to qualified immunity on Plaintiff's excessive force claim.  Thus, the Court grants in part and denies in part Defendants' motion for summary judgment.  [Doc. 50.]

## I.      STANDARD FOR MOTION FOR SUMMARY JUDGMENT

Summary judgment must be granted if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law.  *Id.*  The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party.  *Id.* at 249.

When ruling on the motion, the court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor.  *See Reeves v. Sanderson Plumbing*

*Products, Inc.*, 530 U.S. 133, 150 (2000).  The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial.  *Id.* At 324-26.  The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## II.   BACKGROUND

In the following factual summary, the Court presents the undisputed facts as well as other evidence in the light most favorable to plaintiff Joseph Knight, resolving all factual disputes in his favor.  *See Reeves*, 530 U.S. at 150.  The summary is not intended to represent the Court's actual findings of fact.

Mr. Knight was 67 years old in August 2007 and suffered from multiple disabilities, including Parkinson's disease, normal pressure hydrocephalus (causing changes in his gait, slowing of his mental function, and incontinence), degenerative disc disease, a prosthetic hip, and sciatic nerve damage in his left leg.  (J. Knight Dep. at 18-22.)  Because of these conditions, Mr. Knight has a shunt in his brain.  (*Id.* at 18-19.)  After receiving the shunt in approximately

2005, Mr. Knight was able to walk for only about three weeks after the operation before losing his ability to ambulate freely.  (B. Knight Dep. at 30-31.)

Since then, Mr. Knight has had to use a rolling walker called a Rollator or a wheelchair to move around.  (J. Knight Dep. at 48; B. Knight Dep. at 20-21.) Even with these devices, he is not very mobile and has not ambulated or rolled to his own mailbox in five to seven years.  (J. Knight Dep. at 49.)  Since receiving the shunt, according to Mrs. Knight, Mr. Knight has also tended to get agitated more easily because he has had difficulty accepting his disabilities.  (B. Knight Dep. at 30.)

In August 2007, Mr. Knight "was in terrible shape emotionally."  (J. Knight Dep. at 24.)  "He wanted to die because he could not live with the fact that he would never be able to walk again."  (B. Knight Dep. at 23.)  On August 10, 2007, Mr. Knight asked Mrs. Knight to get him some liquor from the liquor store.  She brought two malt liquor bottles home.  (*Id.* at 21.)  Mr. Knight started drinking that night.  (*Id.*)  Over the next two days, Mr. Knight consumed about half of one of the liquor bottles.  (J. Knight Dep. at 46.)

The night of August 12, 2007, Mr. and Mrs. Knight had an argument.  Both the Knights sleep in the family room—Mrs. Knight on the couch and Mr. Knight in a leather armchair that helps support his back.  (*Id.* at 41.)  According to Mr. Knight, he had taken some Tylenol and aspirin and drank "a little bit of alcohol" that evening.  (*Id.* at 55.)  He was very upset at not being able to walk and in his frustration at his situation, knocked over an empty glass and a bottle.  (*Id.* at 56.)

4

This activity woke Mrs. Knight as she slept on the couch.  (*Id.*)  The glass was empty but hit Mrs. Knight's blanket.  (*Id.*)  According to Mr. Knight, the glass did not touch Mrs. Knight.  (*Id.* at 57-58.)

According to Mrs. Knight, Mr. Knight woke her up because he was having a nervous breakdown.  (B. Knight Dep. at 22.)  He was drunk and started using profanity and telling Mrs. Knight that he hated her when she woke up.  (*Id.* at 23-24.)  Mr. Knight "slapped" an empty glass at Mrs. Knight while she way lying on the couch.  (*Id.* at 24.)  She lifted the blanket to cover her face, and the glass glanced off of one of her fingers without leaving a mark or causing any pain.  (*Id.*)  Mr. Knight told Mrs. Knight that he was going to call 911 to report that Mrs. Knight let him take some pills.  (*Id.* at 26.)  Mrs. Knight preempted his report by calling 911 herself.  (*Id.* at 28.)

Mrs. Knight called 911 for an ambulance to take Mr. Knight to a hospital to treat him for a nervous breakdown.  (J. Knight Dep. at 58; B. Knight Dep. 42.)  Mrs. Knight reported that Mr. Knight had overdosed on pills, that he needed medical attention, and that she was calling for an ambulance.  (Radio Traffic CD-ROM 1, Track 1, Aug. 12, 2007.)  Mrs. Knight told the 911 operator that Mr. Knight had hydrocephalus, which made him irate and very hard to deal with. (*Id.*)  Mrs. Knight also told the 911 operator that Mr. Knight had thrown a glass at her and was coming after her, but that he did not have any weapons.  (*Id.*)  Mrs. Knight initially denied that there were any weapons in the house but later told the 911 operator that Mr. Knight had a bowie knife beside his chair in the living

room. (*Id.*) During the phone call, Mr. Knight was yelling in the background that Mrs. Knight was lying and was just trying to get him out of the house. (*Id.*)

While on the phone with the 911 operator, Mrs. Knight left the house and walked out in the front yard. (Riffle Dep. at 8-9.) At this point, Mr. Knight was the only person in the house. Mrs. Knight had called 911 to get medical attention for Mr. Knight, but in addition to the ambulance, the operator dispatched law enforcement personnel to address a domestic dispute. (*Id.*) Deputy Robin Riffle with the Forsyth County Sheriff's Office arrived on the scene first and approached Mrs. Knight for more information. (*Id.*) Mrs. Knight showed Deputy Riffle where on her finger the glass that Mr. Knight had thrown had touched her. (*Id.* at 10.) Deputy Riffle did not see any sign of injury. (*Id.*) Mrs. Knight also told Deputy Riffle that Mr. Knight was disabled, could not walk, and needed medical attention. (B. Knight Dep. at 66.)[2] When Deputy Riffle asked if Mr. Knight had any weapons in the house, Mrs. Knight told Deputy Riffle that the couple had three unloaded guns in their bedroom closet. (*Id.* at 41.) The Knights had no bullets in the house, however. (*Id.*) The Knights kept the guns wrapped in a

---

[2] Deputy Riffle admits that Mrs. Knight told her that Mr. Knight had some sort of a brain condition, but she states that she did not receive more information than that about Mr. Knight's head injury. (Riffle Dep. at 11.) Deputy Riffle disputes that Mrs. Knight told her that Mr. Knight could not walk, that he was disabled, or that Mr. Knight needed the Rollator to move around. (*Id.*) Mrs. Knight told the 911 operator, however, that Mr. Knight had a shunt in his head for hydrocephalus that was causing him to be irate. (Radio Traffic CD-ROM 1, Track 1, Aug. 12, 2007.) After Sergeant Finley shot Mr. Knight with the beanbag munition, Mr. Knight told Deputy Tanner that he was disabled during one of their recorded phone calls. (Radio Traffic CD-ROM 1, Track 79, Aug. 12, 2007.) While it is not entirely clear to the Court what information Deputy Riffle gathered from Mrs. Knight that she did or did not pass on to other officers, the radio traffic and recorded phone calls between Mr. Knight and Deputy Tanner indicate that by the time the officers shot chemical gas into Mr. Knight's room, at least Deputy Tanner and anyone listening to the phone call knew that Mr. Knight was disabled.

blanket behind several golf club bags in the closet and had not used them in decades. (J. Knight Dep. at 112-13.) Mrs. Knight also told Deputy Riffle that Mr. Knight was not strong enough to wield a gun. (B. Knight Dep. at 41.)

By this time, several other officers had arrived at the Knights' house. Mrs. Knight refused to give the officers permission to enter the house. (*Id*. at 42.) Believing that exigent circumstances existed based on the danger that Mr. Knight seemingly presented to himself, Mark Hoffman, Benjamin Finley, Lawrence Tanner, R.H. Freeman, David Marsh, and other officers with the Forsyth County Sheriff's Office entered the Knights' home. (Hoffman Dep. at 15; Finley Dep. at 28-29; Tanner Dep. at 23.) Mr. Knight was in his bedroom with the door shut. (Finley Dep. at 31-33; Tanner Dep. at 10-11.) The officers tried to get Mr. Knight to leave his room. (Finley Dep. at 31-33; Tanner Dep. at 10-11.) They began trying to converse with him through the door. (Finley Dep. at 31-33; Tanner Dep. at 10-11.) Mr. Knight alternately ignored the officers or forcefully told the officers using threats and profanity to leave his home. (Finley Dep. at 53; Tanner Dep. at 12-16; Radio Traffic CD-ROM 1, Track 43, Aug. 12, 2007.)

Mr. Knight was highly skeptical of the Forsyth County Sheriff's Office because of a prior incident with the agency at his house in 1997. (Radio Traffic CD-ROM 1, Track 43, Aug. 12, 2007.) The prior incident began with a fight between Mrs. Knight and the Knights' son. (B. Knight Dep. at 5.) Law enforcement was called out to the house to address the argument. At some point

during the 1997 incident,[3] officers from the Forsyth County Sheriff's Office hit Mr. Knight in his face and broke his arm.  (Radio Traffic CD-ROM 1, Track 43, Aug. 12, 2007 (containing Mr. Knight's description in 2007 of the 1997 incident).) Law enforcement arrested Mr. Knight and charged him criminally for events that occurred during the incident.  (J. Knight Dep. at 28, 31.)  Mr. Knight defended himself in a criminal trial and was acquitted of all charges.  (*Id.*)  He brought a civil rights lawsuit in federal court against the Forsyth County Sheriff's Office for his injuries and lost that civil trial.  (B. Knight Dep. at 12.)  The 1997 incident left Mr. and Mrs. Knight with a significant distrust of the Forsyth County Sheriff's Office.  (B. Knight Dep. at 11, 42-43; Radio Traffic CD-ROM 1, Track 43, Aug. 12, 2007.)

While several officers were inside the house trying to get Mr. Knight to leave his bedroom, Deputy Riffle was looking through the bedroom windows and reporting her observations to officers inside the house.  (Riffle Dep. at 16-17.)  Mr. Knight saw officers outside the windows and waved both of his hands to show them that he was not a threat to the officers.  (Radio Traffic CD-ROM 1, Track 47, Aug. 12, 2007; J. Knight Dep. at 114.)  An officer announced over the radio that he could see Mr. Knight through the window waving both of his hands.  (Radio Traffic CD-ROM 1, Track 47, Aug. 12, 2007.)

---

[3]  The parties have provided scant detail about this prior incident in 1997 between the Knights and the Forsyth County Sheriff's Office.  The information the parties provided describes only the beginning and the end of the incident—hence, the Court's description of the 1997 events is confined to the very basic facts above.

During these interactions with officers inside and outside the home, Mr. Knight came to his bedroom door three separate times. (J. Knight Dep. at 83.) The second time, he looked out the door and saw a number of guns pointed at him. (*Id.* at 84.) He quickly withdrew back into the room. Some time later, Mr. Knight approached the door a third time. (*Id.* at 83.) He opened the door so that his body was fully visible to the officers. (*Id.* at 91.) At that moment, Sergeant Finley, who was close to the bedroom door, shot Mr. Knight at close range in his upper chest in the area of his heart using a "super sock bean bag" to attempt to end the continuing interaction with Mr. Knight. (*Id.* at 91-92; Finley Dep. at 54.)[4] Sergeant Finley estimates that he shot Mr. Knight from about twenty-five feet away. (Doc. 60-1 at 47.) Mr. Knight estimated that Sergeant Finley shot him from about three feet away. (J. Knight Dep. at 91.)

The super sock bean bag is a soft, pellet-like cartridge approved for use in situations calling for less than lethal force. (Hoffman Dep. at 10-11.) Officers are trained to aim the super sock bean bag (also known as a "specialty impact munition") at a person's torso, legs, or buttocks and to avoid shooting a person in the upper chest, head, or groin. (*Id.* at 10; Doc. 60-1 at 32-34.) Officers are also

---

[4] The Court recognizes that Sergeant Finley has a dramatically different version of the events at issue here. According to Sergeant Finley, before he shot Mr. Knight, Mr. Knight threatened, "I am going to get my gun. I'm going to kill you sons of bitches . . . ." (Finley Dep. at 53.) Mr. Knight adamantly disputes that he ever threatened the officers. (J. Knight Dep. at 115-17.) He admits that he threatened to sue the officers and told them that he would "kick [your] ass" in court. (*Id.*; Radio Traffic CD-ROM 1, Track 43, Aug. 12, 2007.) The radio traffic does not reflect that Mr. Knight ever physically threatened the officers. Viewing the evidence in the light most favorable to the non-movant, as the Court must at this juncture, the Court must analyze the excessive force claim as if Mr. Knight did not physically threaten the officers. *Reeves*, 530 U.S. at 150.

trained not to use the bean bag on noticeably infirm people or the elderly. (Hoffman Dep. at 10-11.)   Forsyth County Sheriff's Office training materials regarding use of the bean bag indicate that officers must use "extreme caution" in firing the bean bag less than twenty feet away from the subject.  (Doc. 60-1 at 31.) According to Plaintiff's expert on excessive force, the super sock bean bag manufacturer's instructional materials indicate that shooting a person with the bean bag at close range is considered to constitute lethal force.  (Bedard Dep. at 91.)  The device's optimal firing range is twenty to ninety feet away from the subject.  (Doc. 60-1 at 31.)  Even at the optimal firing range, the manufacturer cautions that shots to the "head, neck, thorax, heart, or spine can result in fatal or serious injury."  (Bedard Dep. at 94.)

After being shot, Mr. Knight went back into his bedroom and lay down on the bed.  (J. Knight Dep. at 92.)  He was bleeding profusely.  Deputy Tanner reached Mr. Knight via the telephone again to ascertain Mr. Knight's condition. Mr. Knight answered the phone, sounding less coherent and agitated than before. (Radio Traffic CD-ROM 1, Track 67, Aug. 12, 2007.)  Mr. Knight told Deputy Tanner that he needed medical attention and that he had not done anything that warranted an officer shooting him.  (*Id.*)  After telling Deputy Tanner, "I'm in here right now if you want to shoot me some more" and "I don't have [any] weapons," Mr. Knight hung up.  (*Id.*)  Deputy Tanner reached Mr. Knight via telephone again, but Mr. Knight did not verbalize any response.  (Radio Traffic

CD-ROM 1, Track 76, Aug. 12, 2007.)  When Deputy Tanner tried to call Mr. Knight again, he got a dial tone and then an answering machine.  (*Id.*)

Deputy Tanner reached Mr. Knight via the telephone a few more times, with Mr. Knight sounding less coherent and lucid with each conversation.  (Radio Traffic CD-ROM 1, Tracks 79, 86, Aug. 12, 2007.)  Mr. Knight informed Deputy Tanner that he had a hole in his chest from the shooting, that he was disabled, that he was bleeding, that he was lying on the bed, and that he did not have any weapons.  (Radio Traffic CD-ROM 1, Track 79, Aug. 12, 2007.)  Officers outside the house could see Mr. Knight alternately lying on his bed and trying unsuccessfully to get on his feet.  (Radio Traffic CD-ROM 1, Tracks 87, 90, Aug. 12, 2007.)

Sometime after that point, law enforcement threw several canisters of chemical agents into the bedroom.  (Hoffman Dep. at 20-21.)  Officers threw one to two canisters of chemicals through Mr. Knight's bedroom window, breaking the glass.  (*Id.*; Freeman Aff. ¶17.)  Captain Freeman pumped chemical gas through a tube under Mr. Knight's bedroom door.  (*Id.* at ¶16.)  Officers threw one other container of chemicals into Mr. Knight's bedroom after breaking through the door with a breaching ram.  (*Id.* at ¶19; Hoffman Dep. at 20-21.)  They heard some coughing within the room, but Mr. Knight did not come out of the room.  (*Id.* at 22.)  Law enforcement then forced their way into the room.  (*Id.*)  According to Mr. Knight, he was lying on his bed at this point, covered in blood.  (J. Knight Dep. at 92-93.)  According to Mr. Knight, the officers threw

him off of his bed and kicked him before dragging him out of the house.  (*Id.* at 93-95.)[5]  Captain Hoffman admits to hitting Mr. Knight in his shoulder while officers handcuffed Mr. Knight and removed him from the house.  (Hoffman Dep. at 24-27.)  Deputy Marsh also admits that he used his knee to strike Mr. Knight's left thigh.  (Marsh Aff. ¶13.)

Law enforcement searched the house for evidence after physically removing Mr. Knight.  They did not find any knives of evidentiary value inside the house.  (Riffle Dep. at 34.)  The officers found and collected two shotguns and a rifle from the bedroom.  (Riffle Dep. Ex. 2 at 6.)[6]  None of the firearms was loaded.  (B. Knight Dep. at 41; J. Knight Dep. at 112.)  The entire incident lasted about five hours.  (*Id.* at 47.)  After the incident, Mr. Knight was hospitalized for nine days with a sizeable hematoma from where Sergeant Finley shot him in the chest.  (*Id.* at 71-72.)  Mr. Knight attributes a significant decline in his physical and mental condition to this incident.  (*Id.* at 17-25.)

---

[5]  Defendant Hoffman reports finding Mr. Knight in the adjoining bathroom slumped down around the toilet after they burst into his bedroom.  (Hoffman Dep. at 22.)  Mr. Knight reports that he was lying on his bed when the officers burst in.  (J. Knight Dep. at 92-93.)  The Court is not clear whether this factual dispute is material, but to the extent that it is, the Court is bound at this stage to accept the facts in the light most favorable to Mr. Knight—that the officers found him on his bed, picked him up, and dropped him on the floor.

[6] Deputy Riffle reported that she found the firearms on top of the Knights' bed in the bedroom. (Riffle Dep. Ex. 2 at 5.)  Both Mr. and Mrs. Knight have testified that at all relevant times, the firearms were in their bedroom closet, unloaded.  (B. Knight Dep. at 41; J. Knight Dep. at 79.)  Defendants have submitted a photograph of three firearms lying on a towel on top of a bed. (Doc. 56 Ex. 1.)  The Court has no other information, however, about this photograph—such as whether the firearms were moved before the photograph was taken and what bed is in the photograph.  Because at this stage the Court must accept the facts in the light most favorable to Mr. Knight, the Court finds that the guns were in the Knights' bedroom closet throughout the relevant portions of the incident.

Prosecutors charged Mr. Knight with simple battery as an act of domestic violence and obstructing law enforcement. (B. Knight Dep. Ex. 3 at 2.) After being released from a local hospital, Mr. Knight had to refrain from having any contact with Mrs. Knight while the charges were pending because he had been charged with domestic violence. (J. Knight Dep. at 105-06; B. Knight Dep. Ex. 3 at 4.) On August 30, 2007, Mr. Knight accepted a plea deal that included no contest pleas on both counts. (*Id.* at 3, 5-7.) He pled no contest to the charges because he did not want to be away from Mrs. Knight any longer, and his attorney had advised him that a trial might take up to two years. (*Id.* at 4; J. Knight Dep. at 105-06.) He received a twenty-four month probationary sentence and went home that night. (*Id.*; B. Knight Dep. Ex. 3 at 6-7.)

Mr. Knight filed this lawsuit alleging several civil rights violations under federal law on July 2, 2009. (Compl.) The Court's predecessor in this case, the Honorable Thomas W. Thrash, Jr., previously dismissed all of Plaintiff Knight's claims except his claims under the Fourth Amendment of the Constitution of the United States against the remaining Defendants in their individual capacities. (Doc. 27.) After discovery and additional briefing that the Court requested, the matter is now before the Court on Defendants' motion for summary judgment. (Doc. 50.) The Court notes additional facts below as needed, keeping in mind the standard at the summary judgment stage.

## III.   DISCUSSION

### A. ALLEGED UNCONSTITUTIONAL SEARCH

#### i.  Fourth Amendment

The Fourth Amendment of the Constitution of the United States covenants to the people the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  This freedom is nowhere more protected than within the home.  "We have . . . lived our whole national history with an understanding of 'the ancient adage that a man's house is his castle to the point that the poorest man may in his cottage bid defiance to all the forces of the Crown.'"  *Georgia v. Randolph*, 547 U.S. 103, 115 (2006) (quoting *Miller v. United States*, 357 U.S. 301, 303, 307 (1958) (reversing criminal conviction where officers, without a warrant, "put [their] hands inside the door and pulled and ripped the chain off" when defendant tried to close the door on officers who were outside the house)).

In order to set foot in a person's home, law enforcement must have a warrant absent "the exigencies of the situation mak[ing] the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment."  *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978) (reversing homicide conviction where police entered home without a warrant and conducted a "four-day search that included opening dresser drawers and ripping up carpets").  Any such exception to the warrant requirement is "'strictly

circumscribed by the exigencies which justify its initiation.'"  *Id.* at 393 (quoting *Terry v. Ohio*, 392 U.S. 1, 25-26 (1968)).

Courts have recognized limited exigent circumstances where police may enter a person's home without a warrant, including when the officers objectively have reason to believe that someone inside the home is seriously injured or is in danger of serious injury.  *See Brigham City v. Stuart*, 547 U.S. 398, 403-04 (2006).  In *Brigham*, police went to address an early morning complaint about a loud house party.  At the house, the officers saw two juveniles drinking beer in the backyard.  As the officers went into the backyard, they saw a fight break out in the house through the windows and screen door of the house.  *Id.* at 401.

A juvenile male was beyond the control of four adults inside the kitchen. *Id.*  He hit one of the adults in the face.  *Id.*  The officers observed the adult victim spitting blood into a nearby sink.  *Id.*  The other adults pressed the juvenile up against a refrigerator in an attempt to restrain him, causing the refrigerator to move across the floor.  *Id.*  At this point, one of the officers opened the screen door and entered the kitchen, announcing the officers' presence.  *Id.*  Under those circumstances, the Court found that "the officers had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning."  *Id.* at 406.  The Supreme Court held that the officers were justified in entering the house pursuant to the "emergency aid" exception to the warrant requirement, which allows law enforcement to

"enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* at 403.

The Eleventh Circuit recently found an intrusion reasonable under the emergency aid exception to the warrant requirement where an officer entered the home of a woman based on the officer's reasonable belief that the woman was attempting suicide. *Roberts v. Spielman*, 643 F.3d 899 (11th Cir. 2011).  In *Roberts*, a friend of Ms. Roberts called the police to report that she feared that Ms. Roberts, who had a history of suicide attempts, had killed herself in her home.  *Id.* at 902.  A local deputy responded by coming to the house and initially knocking several times on the front door and bedroom window.  *Id.*  He then walked to the back of the house and knocked on the back door several times.  *Id.* The deputy then opened the back door several inches to peer into the house.  *Id.* Ms. Roberts saw him and demanded that he identify himself.  *Id.*  The deputy said he was with the local sheriff's office and instructed her to come outside and talk to her friend.  *Id.*

Ms. Roberts refused, forcefully ordering the deputy to leave her house and telling him that he could not make her leave her home.  *Id.*  The deputy told Ms. Roberts to calm down and to stop referring to him in a derogatory manner.  *Id.* Ms. Roberts responded, "Get the f--- out of my house or I will—."  *Id.*  At that point, the deputy grabbed Ms. Roberts' arm and escorted her out of the house to talk to her further.  *Id.* at 902-03.  The interaction between the deputy and Ms. Roberts lasted about five minutes.  *Id.* at 903.  Once the deputy determined that

Ms. Roberts was not attempting suicide, the exigency ceased and the deputy left the property. *Id.* at 906. Under these circumstances, the *Roberts* court found that the deputy had probable cause to believe that Ms. Roberts was in danger. *Id.* at 905. Even once the deputy observed that Ms. Roberts was alive, it was reasonable for the deputy to believe that she posed a continuing danger to herself. *Id.* The *Roberts* court stressed, however, "the limited scope of [the deputy's] entry into the home and encounter with Roberts." *Id.* at 906.

In this case, Mrs. Knight had reported to law enforcement that Mr. Knight had overdosed on pills, that he was disabled and had hydrocephalus, and that he was having a nervous breakdown. Given the highly analogous facts of the *Roberts* case, it was reasonable for law enforcement officers in this situation to enter the house to make contact with Mr. Knight and ascertain his condition. *See also Michigan v. Fisher*, 558 U.S. _____, 130 S. Ct. 546, 549 (2009) (approving law enforcement's brief entry into home where officers reasonably believed that the subject had injured himself, needed medical treatment, and was about to hurt or had already hurt another person). Once law enforcement was able to make phone contact with Mr. Knight and establish that he at least did not pose a threat of suicide or violence, a reasonable jury could find that the exigent circumstances had dissipated. *See Roberts*, 643 F.3d at 906; *see also Kentucky v. King*, 563 U.S. _____, 131 S. Ct. 1849, 1858 (2011) (observing that "the exigent circumstances rule justifies a warrantless search when the conduct of the police preceding the exigency is reasonable in the same sense"); *Mincey v. Arizona*, 437

U.S. 385, 393 (1978) (finding that police were not justified in searching house after all persons in house had been located; observing that a warrantless search must be "strictly circumscribed by the exigencies which justify its initiation") (quoting *Terry v. Ohio*, 392 U.S. 1, 25-26 (1968)).  Because Defendants arguably violated Mr. Knight's constitutional right to remain free from unreasonable searches, summary judgment hinges on the issue of qualified immunity, which the Court addresses below.[7]

### ii. *Qualified Immunity*

Law enforcement officers who perform a discretionary function generally enjoy immunity from the "fear of personal monetary liability" and from harassing litigation that "will unduly inhibit officials in the discharge of their duties" provided their "actions could reasonably have been thought consistent with the rights they are alleged to have violated."  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).   However, a government official's immunity for individual liability is qualified and may be pierced where the facts a plaintiff alleges (1) reveal a constitutional violation (2) according to "clearly established" law at the time of

---

[7] Plaintiff Knight argues that law enforcement's entry into his house was illegal also because the officers did not knock and announce their presence before entering the house.  In June 2006, fourteen months before law enforcement entered Mr. Knight's home in August 2007, the Supreme Court reiterated that officers need not knock and announce their presence to occupants when "circumstances present a threat of physical violence . . ." inside the home. *Hudson v. Michigan*, 547 U.S. 586, 589 (2006) (quoting *Wilson v. Arkansas*, 514 U.S. 927, 936 (1995)).  As the Court has discussed above, at the time they entered the home, law enforcement officers reasonably believed that Mr. Knight had harmed himself or was going to harm himself. Thus, the Court finds that the officers' failure to knock and announce their presence before entering the home does not render their entry unreasonable under the Fourth Amendment.

the violation.  *Id.* at 639-40; *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (observing that courts have flexibility to determine which step of qualified immunity analysis to address first).

Under Mr. Knight's version of the facts, Defendants may illegally have remained in his house after the exigent circumstances justifying their entry dissipated.  Yet, in August 2007, Eleventh Circuit law surrounding the legality of entering a suicidal person's home was not clearly established.  *See Roberts*, 643 F.3d at 906 (observing in 2011 that "no binding precedent [existed] that clearly established that probable cause and exigent circumstances immediately evaporate once an officer performing a welfare check for a possibly suicidal person sees that the person is merely alive").  Moreover, courts are reluctant to set bright line limits on an officer's ability to prevent harm where specific, potential dangers exist.  *Ryburn v. Huff*, 565 U.S. _____, 132 S. Ct. 987, 990 (2012) (observing in discussing exigent circumstances cases described above, that "[a] reasonable police officer could read these decisions to mean that the Fourth Amendment permits an officer to enter a residence if the officer has a reasonable basis for concluding that there is an imminent threat of violence"); *Michigan v. Fisher*, 558 U.S. _____, 130 S. Ct. 546, 549 (2009) ("Only when an apparent threat has become an actual harm can officers rule out innocuous explanations for ominous circumstances. But the role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties.") (internal quotation marks omitted).  Thus, Defendants are entitled to qualified

immunity for remaining in Mr. Knight's home once exigent circumstances regarding Mr. Knight's immediate health ceased to exist.

### B. ALLEGED UNCONSTITUTIONAL SEIZURE

#### i. *Heck v. Humphrey Is Inapplicable to Plaintiff's Claims*

Defendants argue that because Mr. Knight pled guilty to obstructing a law enforcement officer under O.C.G.A. § 16-10-24, he is precluded under *Heck v. Humphrey*, 512 U.S. 477 (1994), from suing Defendants for using excessive force against him. Section 16-10-24 provides:

> a person who knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties is guilty of a misdemeanor.

*Heck* precludes a criminal defendant from later suing under 42 U.S.C. § 1983 for a civil tort if judgment in his favor would imply the invalidity of his conviction. *Heck*, 512 U.S. at 487 ("if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed"). Here, the claim that law enforcement used excessive force does not undermine Mr. Knight's conviction for obstructing a police officer because under Georgia law, the crime of obstructing a police officer does not require or imply a finding that Mr. Knight used such force against a police officer so as to justify the officer's use of the level of force at issue here. *See generally Taylor v. Freeman*, 447 F. App'x

78, 79-80 (11th Cir. 2011) (approving of trial court's finding that under *Heck v. Humphrey*, plaintiff's conviction for obstructing officer under O.C.G.A. § 16-10-24 did not bar plaintiff's later claim of excessive force under 42 U.S.C. § 1983); *cf. Dyer v. Lee*, 488 F.3d 876, 879-80 (11th Cir. 2007) (observing in finding that *Heck* is concerned only with § 1983 suits that create "two inconsistent judgments arising out of the same facts," that a "successful § 1983 claim against an arresting officer for using excessive force does not necessarily negate an element of the underlying charge of resisting arrest with violence").

### ii. *Excessive Force*

To determine whether the officers' force was reasonable in this case, the Court must assess "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Lee v. Ferraro,* 284 F.3d 1188, 1197 (11th Cir. 2002). Determining whether the level and type of force used in this case was objectively reasonable under the Fourth Amendment requires balancing the nature and quality of the intrusion on the individual's privacy rights with the government interests at stake. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). Some degree of physical coercion is inherent in making an investigatory stop or an arrest. *Id.* The question is whether the force used was excessive under the circumstances, including consideration of the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by

flight." *Id.   See also Dyer*, 488 F.3d at 882 (observing that § 1983 suit for excessive force could proceed even with plaintiff's conviction for resisting arrest with force "so long as the last act in the altercation was one of excessive force by the police").

The issue here is whether, accepting the facts seen in the light most favorable to Mr. Knight as true for purposes of evaluating Defendants' motion for summary judgment, Sergeant Finley's choice to shoot Mr. Knight in the chest with the super sock bean bag and law enforcement's physically forceful removal of Mr. Knight from the house constituted excessive force.  All evidence available to the Court in the record indicates that shooting an elderly person in the upper chest with a super sock bean bag constitutes lethal force, particularly where this shooting occurs at a relatively close range.   According to the Knights, law enforcement understood that Mr. Knight had access to a bowie knife inside the house and several firearms that were unloaded with no nearby ammunition. None of the law enforcement officers saw Mr. Knight actually wield any weapon. (Finley Dep. at 37; Hoffman Dep. at 31-32; Riffle Dep. at 13; Tanner Dep. at 15.) Nor is there evidence in the record that Mr. Knight attempted to assault Sergeant Finley or any other officer before or at the time Finley discharged his weapon. Sergeant Finley testified that he had been properly trained in the use of the super sock bean shooting weapon. Therefore, as in *Mercado v. City of Orlando*, 407 F.3d 1152, 1157-58 (11th Cir. 2005), the Court must assume that Finley aimed for Mr. Knight's chest when he discharged his weapon.  ("At this point, we must

assume that Padilla was aiming for Mercado's head based on the evidence that Padilla was trained to use the Sage Launcher, that the weapon accurately hit targets from distances up to five yards, and that Mercado suffered injuries to his head.").

Forsyth County law enforcement officers understood that Mr. Knight had overdosed on pills, had been drinking, was very agitated at his wife and at police being in his house, and had been speaking very aggressively to the officers.[8] They also clearly understood at the point of the shooting that Mr. Knight was relatively elderly—and later, that he was disabled to some extent. Based on the information that Mrs. Knight provided to the 911 operator and to Deputy Riffle, the officers had probable cause to arrest Mr. Knight for simple battery under O.C.G.A. § 16-5-23(a)(1). But simple battery is a misdemeanor offense which prohibits intentional "physical contact of an insulting or provoking nature"— hardly serious conduct warranting use of lethal force. *Id.* Under the facts seen in the light most favorable to Mr. Knight, Mr. Knight was also not actively resisting arrest. *See Reese v. Herbert*, 527 F.3d 1253, 1258-60, 1273-74 (11th Cir. 2008) (finding that under facts seen in light most favorable to plaintiff, plaintiff was not actively resisting arrest by not cooperating with arrest and using profanity and that jury could find that police used excessive force in arresting plaintiff).

---

[8]  As stated above, Defendants argue that Mr. Knight was making physical threats to kill them and physically harm the officers inside his house, which Mr. Knight adamantly disputes. The compact disc of radio traffic and conversations between Mr. Knight and Deputy Tanner does not show that Mr. Knight ever physically threatened the officers. Thus, this case does not present the issue in *Scott v. Harris*, 550 U.S. 372, 380 (2007), where objective, recorded evidence demonstrated that there was no genuine issue of material fact.

Under this totality of these circumstances, the Court finds that a reasonable jury could find that while using force against Mr. Knight may have been justified, using lethal force against Mr. Knight was excessive. *Mercado*, 407 F.3d at 1157-58 (finding under facts at summary judgment stage that officers used excessive force by shooting "less lethal" device at lethal range against suicidal man holding knife pointed at himself who was not actively resisting police and had not "made any threatening moves toward himself or the officers"); *cf. Glenn v. City of Columbus, Georgia*, 375 F. App'x 928, 933-35 (11th Cir. 2010) (finding that officer's use of bean bag gun reasonable where man stated he had a nightmare that he killed children, had threatened to kill himself and others, told officers repeatedly that he would shoot them and that his dog would bite them if they approached, and was about to retreat  into his house where his wife and child remained); *Penley v. Eslinger*, 605 F.3d 843, 851-52 (11th Cir. 2010) (finding officer's use of lethal force reasonable where teenage boy had held classmate hostage and pointed realistic-looking fake gun directly at officers).

Likewise, a reasonable jury could find under Mr. Knight's version of the facts that law enforcement used excessive force in removing Mr. Knight from the home.  According to Mr. Knight, he was lying on his bed covered in blood when officers entered his room.  Just prior to entering the room, the officers had exposed Mr. Knight, an older disabled man, to at least two cans of chemical agents.  The last several tracks on the compact disc of radio traffic the parties provided indicate that Mr. Knight was very groggy toward the end of the incident

and had fallen to the floor in an attempt to get off of the bed.  (Radio Traffic CD-ROM 1, Tracks 86-87, 90, Aug. 12, 2007.)  The Court has concerns that a 67-year-old man with a number of disabilities who had been shot in his upper chest and subjected to several cans of chemicals meant to subdue him could pose any significant physical threat to officers at that point.  Accordingly, a reasonable jury could find that Captain Hoffman and Deputy Marsh[9] used excessive force in throwing Mr. Knight from his bed and kicking him before dragging him out of the house.  *See Reese*, 527 F.3d at 1273-74 (finding officers were not entitled to qualified immunity where while suspect "lay face down on the ground, all four defendants piled on top of him and began kicking and beating him. One or more of the defendants continued twisting his arm behind his back despite his repeated screams that they were breaking his arm."); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) ("If credited by the fact finder, this evidence suggests the officers used excessive force in beating Slicker even though he was handcuffed and did not resist, attempt to flee, or struggle with the officers in any way.").

---

[9] Deputy Tanner and Captain Freeman also took part in the arrest that Mr. Knight challenges here, but Mr. Knight has not presented any evidence to show that either officer ever participated in the alleged beating and dragging.  Thus, under the summary judgment standard, the Court does not have enough information to show that a genuine issue of material fact exists that either Deputy Tanner or Captain Freeman is liable for excessive force.  The Court therefore **GRANTS** summary judgment in Deputy Tanner's and Captain Freeman's favor on Mr. Knight's excessive force claim.

### iii.  *Qualified Immunity*

Defendants Finley, Hoffman, and Marsh are not entitled to qualified immunity on Mr. Knight's excessive force claims.  It is quite clear that the Fourth Amendment requires the police to effect reasonable seizures.  *See Graham v. Connor*, 490 U.S. 386, 395 (1989) ("we make explicit what was implicit in Garner's analysis . . . that all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard"); *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) ("it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out").  The measures police take to perform their investigatory and protective duties must be commensurate with the objective level of danger posed.  *Los Angeles County v. Rettele*, 550 U.S. 609, 613-15 (2007) (observing that the Fourth Amendment requires balancing personal liberty rights with society's need to protect its members from harm).

Some constitutional violations certainly fall within the gray zones of the "factbound morass of 'reasonableness'" analysis.  *Scott v. Harris*, 550 U.S. 372, 383 (2007) (finding officer's decision to bump driver off road in lengthy, high-speed chase reasonable).  But other unreasonable seizures are clearly established.  *See Mercado v. City of Orlando*, 407 F.3d 1152, 1160 (11th Cir. 2005) ("Using deadly force in a situation that clearly would not justify its use is unreasonable under the Fourth Amendment.")

In *Mercado*, the Eleventh Circuit found that the law enforcement defendants were not entitled to qualified immunity after using lethal force against a suicidal man pointing a knife at himself who was not actively resisting police and had not made any threatening movements toward the police.  407 F.3d at 1157.  Relying on the general and clearly established principle that "deadly force cannot be used in non-deadly situations," the *Mercado* court found that the officer "should not have needed case law to know that by intentionally shooting [the man] in the head," the officer was violating the Fourth Amendment's demand that officers use only reasonable force.[10]  *Id.* at 1160.  The *Mercado* precedent clearly defined the boundaries in 2005 of Defendant Finley's use of the super sock bean bag—a less than lethal device that Defendant Finley could not use in a lethal manner when the circumstances did not justify lethal force.

Defendants argue that *Glenn v. City of Columbus, Ga.*, 375 F. App'x 928 (11th Cir. 2010), is dispositive on the issue of qualified immunity here.  However, in *Glenn*, the Eleventh Circuit discussed law enforcement's use of beanbag munition against a man who stated that he had a nightmare that he killed children, had threatened to kill himself and others, had told officers repeatedly that he would shoot them, and was on the porch of the house where his wife and child remained inside.  In finding that the officers involved were entitled to qualified immunity, the *Glenn* court dismissed *Mercado* as clearly established

---

[10]  In *Mercado*, the Sage Launcher weapon the officer used in the shooting was a "'less lethal' munition that fires a polyurethane baton that is 1.5 inches wide . . . that was not designed to penetrate the body," although it in fact fractured the plaintiff's skull.  407 F.3d at 1155.

law governing the officers' actions in *Glenn* for two reasons.  First, the *Mercado* opinion did not issue until several weeks after the incident at issue in *Glenn*.  *Id.* at 933 n.4.  Second, the victim of police force in *Mercado* was not committing a crime, resisting arrest, or posing an immediate threat to the officers at the time they shot him in the head.  *Id.*  By contrast, *Mercado* was issued two years prior to the events at issue in this case and constituted clearly established, governing law in a case closely analogous to the circumstances of this case—moreover, a case involving the plaintiff's active threat of suicide by holding a knife directed at his own heart.

Additionally, while Mr. Knight ultimately was convicted of obstructing law enforcement and was verbally hostile to the officers, viewing the facts in the light most favorable to Mr. Knight, he posed no imminent threat to himself, to law enforcement officers, or to anyone else at the time Sergeant Finley shot him with the beanbag ammunition.  As Sergeant Finley had been trained in using beanbag ammunition and Forsyth County's own training indicated that shooting an elderly person in the upper chest with the beanbag munition was considered lethal force, *Mercado* clearly establishes for purposes of this case the legal bounds of using nonlethal force weapons in a lethal manner.  *See also City of Houston, Tx. v. Hill*, 482 U.S. 451, 462-63 (1987) (observing in finding Houston, Texas city ordinance that prohibited any person from opposing, molesting, abusing, or interrupting any police officer executing his duties unconstitutional that the "freedom of individuals verbally to oppose or challenge police action

without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state"). Thus, Sergeant Finley is not entitled to qualified immunity based on his use of the super sock bean bag.

Similarly, the law clearly establishes that police officers cannot use excessive force in subduing a suspect or injured person. *See Reese*, 527 F.3d at 1272-73 (finding that law clearly established that law enforcement could not kick and beat man who was not fighting back or attempting to escape, but rather was nonviolently resisting arrest); *Slicker*, 215 F.3d at 1233 (upholding trial court's denial of qualified immunity where officers had kicked the subject in ribs and beat his head while he was on the ground and continued to beat him after man was restrained). Thus, Captain Hoffman and Deputy Marsh are not entitled to qualified immunity for Mr. Knight's allegations that they threw him from his bed, kicked him, and dragged him out of his house after he had already been obviously wounded and further disabled by the subsequent gassing.

## C. CONCLUSION

As set forth above, the Court finds that under current Eleventh Circuit law, Defendants are entitled to qualified immunity on Plaintiff's Fourth Amendment claim that Defendants unlawfully entered and remained in his home. Captain Hoffman, Sergeant Finley, and Deputy Marsh are not entitled, viewing the record in the light most favorable to Plaintiff, to qualified immunity on Plaintiff's

excessive force claim.  Thus, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment.  [Doc. 50.]

The Court **GRANTS** Defendants' motion to strike, [Doc. 78], Mrs. Knight's notice to the Court consisting of a handwritten letter, the list of property that law enforcement seized from Mr. Knight's home, and several photos, [Doc. 77].  Mrs. Knight is not a party to this case and thus, is not entitled separately to present information to the Court.  The substance of the submission does not alter the Court's assessment above.  Additionally, Mr. Knight, through his attorney, has not objected to Defendants' motion to strike.  [Doc. 79.]

The Court **DIRECTS** the parties to mediate this case within 45 days of this Order and **REFERS** this case to the next available magistrate for mediation.  The Court **DIRECTS** the parties to submit their proposed, consolidated pretrial order within 30 days of the mediation in the event that the mediation is unsuccessful.

It is so ORDERED this 14th day of May, 2012.

Amy Totenberg
United States District Judge